[Crim. No. 2904. Second Appellate District, Division One.—November 6, 1936.]

THE PEOPLE, Respondent, v. JACK W. WALKER, Appellant.

George E. Stoddard for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

HOUSER, P. J.—Defendant appeals, not only from a judgment of his conviction of the crime of grand theft, but also from an order by which his motion for a new trial was denied.

It would seem necessary that in substance, a history of the crime in which it was asserted that defendant willingly and knowingly participated be herein related: On each of several occasions that occurred during a period of about ten days which preceded the 25th or the 26th day of April,

1935, a man by the reputed name of Wilson, who represented himself as the confidential agent of another man, whom Wilson named as Landrew, but who in reality was the defendant in this action, was negotiating, or at least was pretending to negotiate, the purchase of a grocery from one Penland, who was the owner thereof. On the said 25th or 26th day of April, Wilson and defendant together appeared at Penland's place of business, and then and there defendant was introduced to Penland. It also appears that on another occasion defendant had been at Penland's store, but that at that time defendant was unable to see him. However, in the course of the conversation that ensued among the several persons then present, the record discloses that Wilson said, ''We about concluded to take your store, Mr. Penland. We have been looking at several and this looks the best, doesn't it?'' Whereupon defendant remarked, ''You have got another one you want to look at.'' Wilson said, ''Yes. We have about decided to take this store. . . . We will see you later.'' Previously thereto, Wilson had told Penland that defendant ''was a man of means, owned properties and dealt in oil stocks and so forth; . . . was buying this store for his nephew''. Several days later, in a conversation that occurred over the telephone between defendant and Penland, the former inquired whether Wilson had been at the latter's place of business. On being told by Penland that Wilson had not been there, defendant stated that Wilson ''would be there within fifteen minutes''. On Wilson's subsequent arrival thereat, which was ''in a short time'', Penland told him that ''Mr. Landrew (defendant) had phoned from Santa Monica . . . and wanted to talk to him''. Whereupon Wilson ''went right in to the phone; . . . he wasn't in there but just two or three minutes''. When he returned to Penland after speaking to defendant, Wilson said to Penland, ''He (defendant) says he wants to talk to you; . . . that is Landrew (defendant) . . . Mr. Landrew (defendant) wants to talk to you again.'' Penland then had a telephonic conversation with defendant, in which defendant said, ''I am very busy; could you come to Santa Monica, and we will close the deal?'' To which query Penland, in effect, responded that he could do so. Wilson and Penland then went to Santa Monica, where they met defendant, at which time and place defendant said, ''I

am awfully sorry, Mr. Penland, but I have got an engagement right now I have got to attend that will take me a couple of hours. Do you mind waiting?'' In effect, Penland responded that he would not ''mind waiting''. Defendant then left Wilson and Penland together, and they ''went right across to the ocean front . . . and sat down on a bench a minute''. With reference to subsequent occurrences, Penland in part testified as follows:

''Well, we sat there a little bit and then got up and started to move away along the ocean, and Wilson saw a large envelope on the grass. He stooped over and picked it up and says, 'Somebody has dropped an envelope here,' and he picked it up and went and sat down on the bench again and opened it up. There was a $100,000.00 bond in it to start with. This man was under a $100,000.00 bond apparently, that dropped it. There was $40.00 in cash, eight $5.00 bills in there. And he read the contents of the envelope, a letter, rather, and so he says, 'That is very valuable to somebody.' I said, 'It sure is.' So about that time— . . . a fellow came along, . . . Well he, was kind of looking along, and I said, 'I expect that is the fellow who lost the envelope,' to Mr. Wilson, and, of course, I just said, 'Have you lost something?' And he said, 'I certainly have. I lost an envelope that means a good deal to me.' So I says, 'What is the name?' He said, 'Holcomb.' I said, 'I guess this must belong to you, then.' I took the leading part in it. So Wilson turned it over to him. Wilson had the envelope all the time. . . . And so Holcomb took these bills and handed them to Wilson and Wilson said, 'No, I don't want anything like that when I know it is yours.' So, we stood there just a moment, and Wilson says, 'Well, we see by the contents of that envelope that you are pretty well informed on the stock market. I should think you would put us on to something.' And he said, 'Well, you have read that. You see what I am getting from headquarters now. I couldn't very well do anything along that line. But,' he says, 'I will tell you what I will do. You take this $40.00 and go put it on American Can,' . . . ''

Thereupon, following a somewhat familiar course which is of no particular importance here, Penland was ''fleeced'' out of $250 by Wilson, Holcomb and another man. At no time thereafter did either Wilson or defendant ever ap-

proach Penland with reference to the purchase or proposed purchase by the former of the latter's store.

On the trial of the action it was neither asserted nor attempted to be proved by the prosecution that defendant either directly participated in the actual commission of the offense for the commission of which he was being prosecuted, or even that he was personally present at the time when and the place where the crime was actually committed. To the contrary, defendant's conviction depended upon legal proof of his membership in the conspiracy, or of his having been a party to an agreement to commit the crime.

Appellant concedes the fact that on the occasion in question the crime of grand theft was committed.

 Apparently without conflicting authority with reference thereto, as a matter of common knowledge, the law recognizes the fact that where two or more persons have engaged in the commission of some criminal act, their antecedent agreement or common understanding, one with the other or the others, so to do, ordinarily has been entered into in secret; but mainfestly, where the crime is shown to have been committed by two or more individuals who in its commission have acted in concert, one with the other or the others, it is an inevitable conclusion that the crime was the result of an agreement or conspiracy between or among the participants therein that the crime should be committed.

In the instant matter, since it is conceded that the crime of grand theft was committed, in which each of several persons took a wilful and deliberate part in its commission, it follows that each of such persons was a member of a conspiracy to commit the crime. Undeniably, the man Wilson, who first approached Penland, and who thereafter and even in the final stages of the commission of the offense took a very prominent part in its execution, was one of such members. He not only was present at the inception of the execution of the scheme to defraud Penland, but actually took the leading part in all subsequent steps up to the moment when the money of which Penland was defrauded was received from him by the conspirators. Evidently the pretended purchase of Penland's store was simply a part of the scheme in which defendant herein assumed the role of purchaser. He was ''a man of means'', solely for the purpose

of impressing Penland with his financial standing and importance. He could not take the time to personally negotiate the proposed purchase. He must have a confidential agent to attend to and arrange for the consummation of such small affairs. He was so busy that he even requested Penland to leave his place of business and go to Santa Monica for the purpose of "closing the deal"; and when in pursuance of the keeping of the engagement so made, Penland arrived at the appointed place of meeting, defendant's time was so occupied that he requested Penland to postpone the consummation of the proposed transaction for "a couple of hours"; and immediately thereafter, under the skilful guidance of Wilson, Penland was led into the trap which theretofore had been set for him. Those facts alone ought to be sufficient to establish defendant's connection with the commission of the crime; but should any doubt remain as to the correctness of such a conclusion, would it be possible for either defendant or Wilson to satisfactorily explain why, after Penland had parted with his money, neither Wilson nor defendant ever thereafter appeared on the scene at Santa Monica? Why did defendant use the assumed name of "Landrew" throughout the entire transaction? More than that, why so abruptly and without any attempt at explanation of their conduct did Wilson and defendant utterly and completely abandon the proposed purchase? Viewing the entire situation,—far from entertaining the existence of a reasonable doubt regarding the question of the guilt of defendant,—to the "mind" of this court the guilt of defendant was established to a degree that closely approached the certainty attained by a mathematical demonstration.

The judgment, and the order by which defendant's motion for a new trial was denied, are affirmed.

York, J., and Doran, J., concurred.